We'll hear the next case on the calendar, United States v. DeSilva. May it please the Court, The government's position in this case spells not the end of QI-TAM under the False Claims Act as we know it, it would spell the end of QI-TAM altogether. The government's position is untenable, and the government's position is clear, and that is regardless of whether a relator voluntarily dismisses a complaint or whether the government dismisses the complaint for the relator over their objection, if the government pursues an alternate remedy after that juncture, the relator is entirely cut out. Here the relator dismissed his complaint voluntarily. He did. Does that make a difference? It does not. Why not? Sure. The principal case the government relies upon is an unpublished decision out of the Fourth Circuit Court of Appeals called Webster v. United States. Webster relied on a number of cases, as did the district judge below, and they relied on cases for the principle that the moment a case is voluntarily dismissed under Rule 41, that the case just poof, goes away, and it no longer factually exists. If you scratch the surface of those cases, none of them stand for that proposition. Every single one of those cases does stand for the proposition that with respect to the merits between the parties, the case as if it never existed. So, for example, issues of law of the case doctrine, issues of res judicata, issues of claim preclusion, that's what those cases stand for, that you cannot point to the earlier case and say, look at the ruling in the earlier case. Now in my second complaint, I'm going to hold a party to that issue. That you can't do. And if you look at the Wright and Miller section that the Fourth Circuit relied upon in Webster and that the district judge incorporated in his opinion, it's the same exact section, section 2367. If you look at the language of Wright and Miller and then go to the footnote, which is footnote 9, and look at the cases, because those are the exact cases the government relies upon, each one of them deals with that exact issue. And so we would posit that the voluntary dismissal does not have the impact that the government purports that it does. Can I ask you about the meaning of the statute? Sure. Looking at the words of the statute. Sure. At least when I see the words alternate, I take that to mean that there have to be two options. Correct. There do. There do, right. There does. There does, sorry. There does. They do have to be. They do have to be, yeah. They do have to be. But in this case, where is the alternate option where there was no action at the time that the government had brought its case? Sure. I would look at the language and focus on two words. And this is in, to be clear, this is in 3730C5. I would look at the word initiating and the phrase if the action had continued. Section C5 contemplates exactly what happened here. All that is required, and let's make our position clear, all that is required for the relator to recover is that a substantively, and that's a key word, a substantively valid key TAM action must have existed at some point in time prior to the government's choosing an alternate remedy. And the case law from other circuits supports this. When you look at, you point to the language of initiating, but when you look at that whole statutory section, they talk about things like the person initiating the action's right to call witnesses. That statutory section is written in such a way that it assumes that the relator will do more than simply initiate the action. Not necessarily true. I mean, there are other aspects where the government can come into the case. Put it this way. If the government decides to intervene under subsection B, then the relator doesn't really do anything in effect either. Well, let me give you this, then, hypothetical. Let's assume that Joe volunteers to fix a tire on Jane's bike and then promptly withdraws the offer. So Jane then fixes the flat tire herself. At the moment that Jane decided to patch her own tire, would we say that Joe's now no longer existing offer to fix it was an alternate remedy? I think the analogy, humbly speaking, has a little bit of a flaw in it. In the respect that in your hypothetical, Joe, if we then put it in our case, Joe supplied the tire. Joe supplied the air. Joe supplied the bike. And in this particular analogy, and again, focusing on our case, this bike couldn't go without Mr. DeSilva. Period. And the government told his counsel below, they had no other relator. They didn't even know about these defects until Mr. DeSilva brought it to their attention. And that's extraordinarily problematic for the government. He is the original source of this information. And the government took that information, and again, the duress angle is a big factor, too. But the government took that information, forced him to, and I would say this is the most involuntary voluntary dismissal I may have ever seen. You do argue it was coercion? Absolutely. It was duress of the highest order. And it's blatant. And it's blatant from the fact that you have unrebutted, an unrebutted affidavit from his attorney below, Solomon Radner, saying that the assistant U.S. attorney at the time, I know she's now left the office, but the assistant U.S. attorney at the time threatened him with an attorney grievance in the state of Michigan, relying on a ethics opinion that had no application to this case. But if he had not withdrawn, wouldn't that bring the arise of the fugitive disentitlement theory? It would not. Tell me why not. If you look at this Court's precedents in Al-Wadalah and if you look at the Supreme Court precedent in Dagan, in Al-Wadalah there's a key footnote. I think it's footnote one in the opinion. I'm almost sure it's footnote one. And the language that this Court said was that a fugitive status does not affect a civil appeal so long as the fugitive status has no substantial bearing on the civil appeal. This is an, his conviction in Michigan is entirely unrelated to the QI-TAM proceeding. That's number one. His criminal conviction is now highly suspect in terms of its validity. Many of the officers that were part of his trial are now being convicted for lying under oath and other issues. But that's besides the point. Has the fugitive disentitlement doctrine never been applied to bar the fugitive from participating in civil-type proceedings? That's a question that came up in Dagan for the Supreme Court. And the Supreme Court said that district courts cannot categorically preclude a fugitive from participating in litigation. There are other remedies that the government can go through and that a district judge can go through to ensure. Like what? For example, there is videoconferencing. There is also facts under the civil rules of procedure. But fugitive disentitlement is a way to take account of bad acts. In the criminal context, if a criminal is a fugitive from the law and he then appeals, on direct appeal, he appeals his conviction. And this is what happened in Awadallah. Then there are certain concerns that do come into play that are not the same concerns. And the Supreme Court has said this. The only concern when you have fugitive status combined with a civil appeal is, is the court of appeals judgment going to be able to be enforced if they decide the case? And is there prejudice to the government? Neither of those criteria are satisfied here. Because of the fact that if Judge Sullivan looked at the case and just saw the complaints themselves and compared them, he would see that there was significant involvement from Mr. DaSilva. And again, going back to Chief Judge Katzen's analogy, this bike wouldn't go without Mr. DaSilva. Is he, just to be clear, is your client still a fugitive? He is still in Brazil, yes. And going back to the district court, was the district court asked to conclude that your client's initial dismissal was not actually voluntary? He was. He uses the word language of pressure. But what was the district court actually asked to do? He was asked to decide a number of issues. He was asked to decide the duress issue. He was asked to decide the statutory issue. He, for whatever reason, did not even address the duress issue, even though Mr. Radnor's affidavit was submitted with the motion. And Mr. Radnor's affidavit was clear. Jamie, nowaday, threatened me with a Michigan ethics opinion. A Michigan ethics opinion that had no bearing on this case. That Michigan ethics opinion dealt with an attorney that was going to potentially provide a car and money to a fugitive to leave the jurisdiction. Here, the government knew exactly where Mr. DaSilva was the whole time. They communicated with him for a matter of three months. They had teleconferences with him over a three-month period. You're saying the attorney wouldn't have been subject to this opinion? I am saying- Decided not to fight it. I am saying that Jamie, nowaday, misrepresented to Judge Nathan the actual relevance of this Michigan ethics opinion. That is exactly what I'm saying. The attorney didn't fight that, didn't fight the duress. Judge Pooler, when an assistant U.S. attorney comes at you and tells you they're going to file grievance commission charges, and you have a bill to pay for your liability malpractice insurance, and she doesn't, in the real world, I understand in court it sounds like one thing, but in the real world, that's a lot of pressure brought to bear. And also, mind you, he did not have a crystal ball in the sense that, well, if I voluntarily dismiss this case, and Mr. DaSilva can come back to the country, we can initiate it. He didn't know that the government was going to two-time them and then file the same exact claims 13 months later. There's no way he could have known that. And besides the fact, even when the government did do that and they filed the settlement, they did it in an underhanded manner to ensure that Mr. DaSilva and his counsel would never know about it. Thank you. Thank you. Good morning, Your Honors. Joseph Cordaro, Assistant United States Attorney for the Southern District of New York on behalf of the United States. Couldn't you have brought this action without Mr. DaSilva's information? No, it's not true, Your Honor. In fact, we did bring the action ourselves. The government doesn't dispute that Mr. DaSilva brought the information to the U.S. Attorney's Office. That's what I'm asking. Without Mr. DaSilva's information, there wouldn't have been an action. Isn't that correct? Well, another key time or later could have stepped forward. But I think the import of Your Honor's question is that Mr. DaSilva- No other key time or later stepped forward. Correct, Your Honor. Without Mr. DaSilva's information, the government would not have brought this action. Isn't that correct? Again, Your Honor, under the current facts, yes. Mr. DaSilva, assuming no other, assuming the government didn't find out about the conduct itself- The current facts are the current facts. Yes, Your Honor. I was asking about the basis in this record. The government could not have brought this action without Mr. DaSilva's information as the record stands now. Based on this record, Your Honor, and the False Claims Act gives relators certain rights when they make disclosures to the government and file a key time action as Mr. DaSilva did here. The critical fact in this case, though, is that Mr. DaSilva voluntarily abandoned those rights when he dismissed his key time action. I just heard Opposing Counsel say that it wasn't altogether voluntary. Mr. Opposing Counsel is reading things into Mr. Radner's declaration that simply aren't there. He says the declaration indicates that Jamie Nowaday threatened him. It says nothing of the sort. The declaration quotes an email that Ms. Nowaday sent to Opposing Counsel. I believe that's on page one. Someone put pressure on Mr. DaSilva to withdraw this action? Not in our view, Your Honor. A key time action is brought in the name of the United States. It is an action in which the United States is the real party in interest. After the complaint was filed, we noticed an allegation in the complaint, I believe it's at page 70 of the joint appendix, that said that Mr. DaSilva was a resident of Michigan. Well, we knew that was flatly untrue because we knew at that time that Mr. DaSilva had already fled to Brazil to escape a Michigan criminal conviction. Did he take up residence in Brazil? I mean, I don't think it's wrong on its face if he intended to return to Michigan. Well, apparently, Your Honor, he didn't intend to return, notwithstanding representations that were made to the government and to the court. You were offended by the fact that he claimed he was a Michigan resident but he was in Brazil? Not at all, Your Honor, not offended. Why did it bother the government? Because the allegation we thought was untrue and in a complaint in which the government is the real party in interest and in which a relator is making allegations in the government's name, obviously the government has an incentive to make sure that those allegations are truthful. His residence had nothing to do with the information he gave you about Ian, right?  If Ian said that he was 6 foot 5 inches tall and he was only 5'6", would you have been as offended as that wrong fact? We weren't offended, Your Honor. If we knew that that was a knowing misrepresentation, then certainly we would query the relator on those allegations. Materiality of the misrepresentation is what I'm asking you. Again, materiality is irrelevant, Your Honor. The question is, is the allegation truthful? And so the government is not going to apply a relevance test to determining whether or not true allegations should be made in a complaint that's filed with the court. The question is, was the allegation truthful? And what we did, as reflected in Mr. Radner's declaration, is we sent him an e-mail. We sent an e-mail to opposing counsel asking them to explain why they chose to make that representation in the complaint and why the continued representation of a fugitive relator complied with the applicable Michigan ethical advisory opinion. Does the fugitive disentitlement doctrine have any applicability here? Not at this point, Your Honor, because I think that you would look to whether or not... At this point, how about at the point the initial complaint was filed by DeSoto? It could, if the government had proceeded in the action, and had intervened, proceeded, filed a lawsuit, the defendant might have had an argument that it was prejudiced by the inability to access the relator. That's a possibility. It's not an issue here, but that's an area where it could have applied, because if there's prejudice resulting from the absence of the party, then surely the other party has a right to bring that to the court. Was there any allegation that there would have been prejudice if he wasn't there? Once you took over the action, did you need Mr. DeSilva to testify? You had all his information, correct? Well, no, we didn't take over the action, Your Honor. You brought an alternative action. No, no, Your Honor. Mr. DeSilva voluntarily dismissed the action. Right. Fifteen months elapsed, approximately, while the government continued the investigation. So to get back to Judge Katzmann's hypothetical, basically the government got on the bike and wrote it itself. And at the end of the race course, the government filed its own action under the False Claims Act, pursuant to Section 3730A, which gives the Attorney General the right to commence his or her own proceeding under the False Claims Act, aside from anything that might happen with a relator. Since you settled that immediately after bringing suit, the next day, wasn't it? Yes, Your Honor. You filed the settlement. Yes, Your Honor. You obviously didn't need Mr. DeSilva to testify. You didn't need his presence in the district. And that may well have been an argument that Mr. DeSilva might have made against the defendant that was asserting fugitive disentitlement doctrine. But from where the government was standing, given the procedural posture of this case, fugitive disentitlement really didn't come into play because Mr. DeSilva had already dismissed the key tam voluntarily. Well, he says it wasn't voluntary. Well, again, Your Honor, the record simply doesn't support that. And in fact, I would point the court to Judge Nathan's orders at page 137 and 138 of the record. Those orders explicitly refer to representations that were made to the government that counsel for Mr. DeSilva would voluntarily withdraw the complaint if DeSilva did not surrender to Michigan authorities by June 23, 2014. That's on page 137 of the joint appendix. Clearly, Mr. DeSilva's continuance of the key tam action in the view of his counsel, based on what the court wrote here, was tethered to whether he was going to surrender or not. And when he did not surrender past a certain date, the court inquired and set a briefing schedule for the government to file a motion to dismiss. Now that process is critical because if the government is going to dismiss a key tam action over the objection of the relator, under section 3730C2A, there has to be a hearing in front of the district court. Now, Mr. DeSilva, at that time, could have raised any arguments about the government's conduct of the investigation to Judge Nathan, who was supervising the key tam. He did not do so. That would have been the time for him to make those allegations. The relator's contentions are also belied by the text that Mr. Radner acknowledges that he sent a USA Now a day on the day the case was settled. That's at page 117 of the joint appendix. It said, nice work on the L3 litigation. And it said, the irony, Milton just called last week and said he wants to come home. Did another relator step up? Just curious. And then, it was nice working with you. I'm happy that we were able to help. That is not the statements of someone who felt threatened by a USA Now a day. And, in fact, you see yet another representation in here that the relator wanted to come home. Well, we know that didn't happen because, as counsel said today, he's still a fugitive. Let me ask you an argument about the textual language and the use of alternate. And I understand your argument about the need to have options. And let's say that that's assumed for the moment that that's correct. Looking at the word alternate, does it have a more specific meaning under subsection C5? So the second sentence of the provision states, and I'm quoting, if an alternate remedy is pursued in another proceeding, the relator will have the same rights as if the action had continued under this section. And under this section is what I want to emphasize. Now, this section refers to Section 3730, at least as I understand it, which governs all civil actions pursuant to the FCA. So if we were to accept your argument, should we read this sentence to mean that alternate remedy refers to something more than just two choices, but in particular refers to a proceeding other than a civil action under the FCA? Yes, Your Honor. I think we would encourage that reading, certainly on the facts of this case. What this provision is saying is that if there's a situation where the relator has an existing key tam, which gives the relator certain rights under the False Claims Act, and those rights are listed in the statute itself, particularly in subsection 3730C. And those rights include the right to a recovery of the proceeds. And then the government engages in an alternate proceeding, such as the one discussed here, an administrative remedy for a civil money penalty. And in that alternate proceeding, essentially litigates or settles the fraud claims that are at issue in the key tam. In other words, Your Honor, the action in this section. Thereby essentially cutting off the bundle of rights that the relator might have because the key tam can no longer continue. That could be an alternate remedy situation. So to answer your question more precisely, Your Honor, the alternate here is... Key tam can no longer continue. That suggests that something will happen to terminate it. But this language, if the key tam action had continued, suggests that the key tam had already been terminated. And isn't that what happened here? Not quite, Your Honor. Because in this section, the assumption is that the government takes an action and engages in an alternate remedy that results perhaps in the stay of the key tam as the government prosecutes its fraud claims via this other proceeding, or perhaps results in the dismissal of the key tam as a result of the government action in a genuine alternate remedy situation. But here, the relator himself dismissed his own key tam before any of this ever happened. And it was telling that the relator could not answer the court's question about what were the alternates here, because there were no alternates here. The time the government filed its complaint, there was no alternative to choose. It was a complaint under Section 3730 of the False Claims Act. And therefore, there was no election. There was no alternate. And, Your Honor, if we continue with the language, the person initiating the action shall have the same rights in such proceeding, in other words, the alternate proceeding, as such person would have had if the action had continued under this section. Well, if we take those bundles of rights, including the right to seek a share, the relator has that right in his key tam as long as the key tam is pending. And if the key tam is successful, then the relator is entitled to a share of the proceeds. But if the relator voluntarily dismisses the key tam, then the relator has no such rights anymore. And so he has no rights that are remaining in the key tam that could possibly be exercised in the other proceeding, including the right to seek a remedy. And this makes sense because another relator could have stepped forward and brought those claims after this relator dismissed his key tam. Of course, in this case, none did. None did, Your Honor. But one could have. And then that relator would have had rights under the statute. I just want to follow up on some of the questioning before with respect to what the district court can do. So if the district court realizes that, and I'm not saying this is this case, but that there is something amiss going on, it has, in your view, the authority to deny the government's motion to dismiss a key tam action. Is that correct? So as Your Honor suggests, this is not the issue today. There are basically, I think, two approaches that have developed in the case law to this. There's an approach in the D.C. Circuit's decision in the Swift case, which agreed with the government that the government has unfettered discretion to dismiss key tams brought in its name. There is a narrower test that was adopted by the Ninth Circuit in a case called Sequoyah. And if I may, I can actually give the court the sites for those cases if that would be helpful. But in the Sequoyah case- Are they cited in your brief? No, they're not, Your Honor. Then you probably should give us the sites. So the Swift case is cited at 318 F3rd 250, and it was decided in 2003. That's the case where the D.C. Circuit said that the government has unfettered discretion to dismiss a key tam brought in its own name. The Sequoyah case is from the Ninth Circuit. It's an earlier case. It was decided in 1998 and reported at 151 F3rd 1139. And the court there required the government to show a rational relationship to a valid purpose when litigating the dismissal of the key tam. We believe that the Swift court was correct not to adopt Sequoyah. This court hasn't definitively held on this issue. Although I will note that in the Vermont Agency of Natural Resources case, which was decided before Swift but the same year as Sequoyah, this court in discussing the False Claims Act generally cited the Sequoyah case with apparent approval. I would only note that that was in dictum. It was pre-Swift, and ultimately the Supreme Court reversed the Vermont Agency of Natural Resources case on other grounds. But that case, this court's decision in that case appears at 162 F3rd 195, decided 1998. So to get back to your Honor's question, our argument to the district court would have been that our discretion to seek dismissal of a key tam is unfettered. And even if the court adopted the Sequoyah approach, that we would have satisfied that approach. But clearly, that didn't happen here because even though the district court was clearly contemplating some kind of proceeding, it had set a deadline for the United States to file its brief in support of its contemplated motion to dismiss. And under the statute, would have been required to hold a hearing where all of this would have been decided. Mr. De Silva short circuited that entire process by simply voluntarily dismissing his complaint, not long before the United States' brief was due. I think it was- He didn't resist dismissal. The government could have moved to dismiss, as we've just been discussing, but he conceded dismissal. Correct, Your Honor. He could have resisted dismissal, but yet he chose to voluntarily dismiss the complaint himself. Thank you. Thank you, Your Honor. I just want to be clear about the record and what the government is saying about Mr. De Silva's choice here. The government represented to Judge Nathan, they were going to dismiss this case either way. He had no choice in the matter whatsoever. Either he was going to voluntarily dismiss this case, or the government was going to do it for him. And the government has just represented to the court that under Swift, they can do that with unfettered discretion. And according to their interpretation of the statute, all they have to do the next time this comes around is dismiss the case for the relator and commence their own case themselves, pocket all the money, relator gets nothing. They have to have a basis for dismissal, don't they? Well, under Swift, it's unfettered. And again, there appears to be a split in authority here. But it does, at least under Swift, say that the government has unfettered discretion. And that is supported by the statutory text, I believe under C-2A. That goes against the policy of the whole QI-TAM statute. And that's exactly my point, Judge Pooler. Their position is contrary to the statutory language and the legislative history. My point is to encourage relators to come forward, correct? We want to encourage them, absolutely. And the government's interpretation of the statute and their position in this case, it goes back to exactly how I opened earlier, will end QI-TAM, period. No relator with any measure of sanity will come forward with allegations, risk potentially life and limb to relate information to the government of fraud if they have to deal with these heavy-handed tactics from the government. And I'm from Brooklyn. We would actually call these breast-knuckle tactics from the government. And I would raise one issue, the civil action cover sheet from the second action before Judge Sullivan. This is what Mr. DeSilva was dealing with. Question. This is on page 45 of the record. Question. And this was, again, this was signed by AUSA Jamie Nowaday. Signed by her. Question. Has this action, case, or proceeding, or one essentially the same, been previously filed in the Southern District at any time? No. Sub-question. If yes, was this case voluntarily dismissed, involuntarily dismissed? Why would the civil action cover sheet ask that question if voluntary dismissal has no effect on this case? It clearly does. Because the cases, the government sites, and, again, that Webster site, have no bearing on this issue. And if you look even at Rule 41, it's not as if the first action goes completely away. Under Rule 41, I believe, A1B, if you file a case and voluntarily dismiss it, then you come back, you commence another action, and you voluntarily dismiss that one, the federal rules clearly say under Rule 41, the action is dismissed with prejudice. Why? Because it's not as if the first case completely disappears. Again, those cases only deal with the merits of the action between the parties. But getting back to the civil cover sheet, it's indicative of the lies that occurred in this case. There were brass knuckle tactics here by the government to ensure that Mr. De Silva and his counsel never caught wind of the settlement. And how do I know that? Because if you look at the copy of the settlement in the record, it was executed the day before the complaint was filed before Judge Sullivan, the settlement was put on the record and stipulated to the day after, and the case was closed to ensure. The Supreme Counsel read us this note from... I can illuminate this note because I happen to know Mr. Radner, and I've spoken to him. He wanted to speak to Mrs. Nowaday because he wanted to see, his main point was he wanted to see if there had been another relator in the case. And he knew if he sent her an email that was derogatory and with a lot of smoke coming out of his ears, she never would have answered his question. He got exactly what he wanted, and now it is in the record, and it is clear. There was no other relator in this case. The government had no other information except what they derived from Mr. De Silva. And the fact that the government marshals and misrepresents to Judge Nathan this Michigan ethics opinion, and they try to get Mr. Radner to, and successfully, try to get the client to voluntarily dismiss this case based on a Michigan ethics opinion that has no bearing on this situation is very telling. And I'll add another point because I investigated this case when I was preparing for this appeal, and although it is not in the record, but I will say this. If this court does decide to send this case back to Judge Sullivan, co-counsel below will testify under oath and or with a sworn affidavit that the reason why Mr. De Silva never came back from Brazil was because AUSA Jamie Nowaday told De Silva's counsel, if he doesn't voluntarily dismiss this case, I'm going to make sure that he gets indicted for lying to the FBI. And Mr. De Silva said, I ain't coming back if that's going to happen. And I understand, granted, I know this is an appellate court that's not in the record, but if you're asking for the real-world explanation as to why he didn't come back, you need to look no further than AUSA Jamie Nowaday. Yet he still hasn't come back to this day. He still has not come back to this day. That is true. He is concerned of still these allegations from the government that they're going to prosecute him for lying to the FBI. I would be kind of concerned coming back too if the government was going to manufacture allegations like that. Thank you. Thank you. Thank you both for your arguments. The court will reserve decision.